Coös,
Dec. 7, 1926.

### OVILA BECHARD v. HARRY B. AMEY, *Trustee*.

A technical expression in a contract may be shown to have been used by the
parties in a different or contrary sense from the accepted meaning in the·
trade.

A stipulation in a contract to cut and haul logs, that the scale of the manufacturer·
of the lumber as it came from the saw shall determine the amount delivered
by the contractor, is binding upon him notwithstanding logs hauled by other·
persons were commingled with those delivered by the contractor, who had
knowledge of this fact and acquiesced in the manufacturer's plan of computing
the amount of his deliveries.

Upon such evidence the jury should have been instructed to deduct from the
total mill scale the amount of logs delivered by others, and the remainder·
after apportionment of any shrinkage would represent the quantity of the·
contractor's logs.

In such case a discrepancy of about nine per cent between the total mill scale·
and the total log scale indicates no fraud in the former measurement.

Certain evidence held not to warrant any inference that the manufacturer in
such case had waived the stipulation that the mill scale should determine the·
amount delivered by the contractor.

If by fair inference a contract imposes a certain mode of performance upon one·
party and his failure so to perform casts an additional expense on the other·
party, he will be entitled to extra compensation therefor.

The right to rescind a contract for breach thereof by the opposite party must be·
exercised within a reasonable time after knowledge of the facts justifying that
right, and the repudiation must be unequivocal; a party's continued per–
formance of a contract and his receipt of benefits thereunder after such knowl–
edge is an abandonment of the right of rescission.

ASSUMPSIT, to recover a balance alleged to be due on a logging·
contract together with compensation for extra work.   Trial by jury·
and verdict for the plaintiff.

The plaintiff's specification was as follows:

"1925, April 1                           Ovila Bechard, Dr.

To cutting, hauling and delivering at mill at Pitts-
burg, as per contract, 1,408,086 bd. ft. of hard
wood and soft wood lumber @ $10.00 per
thousand  . . . . . . . . . . . . . . .    $14,080.86
To extra work rolling and piling logs at mill  . .      300.00
To hay and grain delivered to Burke, the pay for
which was assumed by Amey . . . . . . . .       10.55
To lumber hauled in June  . . . . . . . . . .       93.04
   Total  . . . . . . . . . . . . . . . . .    $14,484.45
   By payments . . . . . . . . . . . . . .     11,500.00
      Balance due  . . . . . . . . . . . . .    $2,984.45"

The contract in question was in writing and contained the follow-
ing provisions:

"An average of not less than twelve thousand feet B. M. per day
to be delivered on the rollway at said steam saw mill on and after
the first day of December, 1924, and all hard wood to be delivered
on rollways at mill before April 1, 1925.

Scale

Scale of the manufacturer and the owner, of lumber at the brow
of the mill shall be final and binding on both parties and is to deter-
mine the amount delivered by the contractor.

. . . the owner agrees . . . to pay the contractor as follows: ten
dollars per thousand feet for all soft wood and ten dollars per thou-
sand feet for all hard wood logs delivered at the said mill, payments
to be made in full, on the fifteenth of each month, for all work done
during the previous month, full settlement and payment to be made
when the work is completed and accepted by the owner."

The essential facts appear in the opinion. Transferred by *Scam-
mon*, J., upon the defendant's exceptions to the denial of his motions
for a nonsuit and a directed verdict, to certain rulings of the court
on questions of evidence, to the denial of his requested instructions
to the jury, and to the denial of his motion to set aside the verdict.

*Sullivan & Daley* and *Ira W. Thayer* (*Mr. Sullivan* orally), for the
plaintiff.

*Harry B. Amey pro se* and *Leon D. Ripley* (*Mr. Amey* orally), for
the defendant.

BRANCH, J. The defendant at the trial asserted and reasserted in various ways his position that the plaintiff's rights were strictly limited by the terms of the written contract. This contention was the basis of exceptions to evidence, of motions for a nonsuit and a directed verdict, of requests to charge the jury and of the motion to set aside the verdict. A decision upon the fundamental question thus presented will therefore go far toward disposing of the numerous exceptions which appear in the record.

The defendant contracted to pay the plaintiff for cutting and hauling the logs on a certain lot at the rate of $10 per thousand feet board measure. The point in dispute between the parties was the quantity of logs delivered by the plaintiff at the defendant's mill. The plaintiff sought to prove by a survey of the logs made at the time when they were delivered that he cut and hauled 1,408,086 board feet. The actual report of this survey was 1,225,961 board feet, but it appeared that in making this computation the surveyor allowed 115 cubic feet to 1,000 board feet. The plaintiff claimed that under the New Hampshire rule (P. L., c. 167, s. 5) the computation should have been made on the basis of 100 cubic feet to 1,000 board feet, and that he was therefore entitled to add fifteen per cent to the surveyor's return. The defendant sought to prove that the lumber manufactured from the logs delivered by the plaintiff, as shown by a survey made at the mill after it was sawed, amounted only to 1,091,733 board feet, and contended that the plaintiff could recover only for this amount by reason of the clause in the contract which reads as follows: "Scale of the manufacturer and the owner, of lumber at the brow of the mill shall be final and binding on both parties and is to determine the amount delivered by the contractor."

The defendant introduced evidence that the words "brow of the mill" mean "the tail of the mill or where the lumber comes out," and although it may be doubted whether this is the accepted meaning of the phrase among lumbermen, the plaintiff did not question the interpretation placed upon it by the defendant. It was in fact conceded by the plaintiff that the clause of the contract above set forth had reference to the measurement of the manufactured lumber as it came from the saw.

With this definition of terms in mind, the meaning and effect of the above provision is not doubtful. The plaintiff agreed that the quantity of logs delivered by him should be determined by the scale of the manufactured lumber as it came from the mill, and unless

some legal ground of relief from this stipulation is established, he is bound by it.

The plaintiff seeks to avoid the effect of this clause upon four different grounds as follows: 1. That no separate scale of his logs was kept at the mill. 2. That the mill scale was fraudulent. 3. That the defendant waived his right to insist upon the mill scale. 4. That the plaintiff was entitled to rescind the contract and recover upon a *quantum meruit.*

These four claims of the plaintiff will be considered in order.

1. It was conceded by the defendant that no separate mill scale of the plaintiff's logs was kept and that a relatively small number of logs hauled by three other contractors, amounting to about 156,354 feet, were mixed with the plaintiff's logs before they were sawed. These facts were well known to the plaintiff, as appears by the following excerpt from his testimony upon direct examination: "Q. Well, did somebody else outside of your crew haul logs? A. No, there was n't any other — Oh, Fred Amey. Q. Did anybody else haul? A. John Laroche. Q. Did he haul separate from you? A. He hauled separate, but it was rolled onto the slip with mine. Q. Well, didn't Amey have another contractor, Arthur Laroche? A. Yes. . . . Q. Now, when the mill was running, you may state whether Laroche's teams and your teams hauled onto the rollway and his logs were mixed with yours? A. Yes, sir. Q. And did you speak to Mr. Cook about it? A. Yes. Q. What did you say to him? A. I asked him how they were going to keep it separate so that I could have mine scaled and he have his. Q. What did he say? A. He was going to take a hundred feet for Laroche, and I would have the rest. Q. What do you mean by a hundred feet? A. Why, a hundred cubic feet. Instead of taking a thousand feet, he took eleven hundred."

From this testimony, which evidently had reference to the mill scale, it is plain that the plaintiff knew during the progress of the work not only that no separate scale of his logs was being kept, but that the defendant proposed to determine the amount delivered by the plaintiff by deducting from the mill scale the amounts hauled by other contractors. There was no evidence that he then objected to this method of computation.

A complete scale of all the lumber manufactured at the mill was kept, and a preliminary scale of the quantity of logs delivered by each contractor was also kept, as will more fully appear hereafter. It would therefore seem that all the data necessary to a computa-

tion of the quantity delivered by the plaintiff upon the basis of the mill scale were available. The total mill scale amounted to 1,248,087 board feet. Clearly, the fact that other logs were added to his would not justify the plaintiff in claiming more than the total mill scale, as he does in this case. The mill scale at least fixed the maximum quantity of logs for which the plaintiff could claim compensation. From this maximum some deductions ought obviously to be made on account of logs hauled by other contractors. The proper amount of such deductions was a question of fact for the jury, and the evidence furnished an adequate basis for a decision upon it.

Since the total amounts of the preliminary scale and the mill scale were in evidence, it would have been easy to compute the percentage of shrinkage upon the whole lot and distribute it among the various contractors in proportion to the amounts delivered by each, according to the preliminary scale. There was also conflicting evidence upon the question whether the plaintiff's logs were of such a character that they would shrink more or less than those drawn by other contractors. Upon all this evidence it would have been possible for the jury to determine how much should be deducted from the total mill scale on account of logs furnished by other contractors, and the remainder would represent with substantial accuracy the quantity of the plaintiff's logs.

The plaintiff's contention that he was not bound by the mill scale, because no separate scale of his logs was kept, must therefore be overruled.

2. Plaintiff's claim that the mill scale was fraudulent was not set up in his pleadings and was first suggested during the discussion of a question of evidence at the trial. It does not appear to have been seriously pressed by the plaintiff during the remainder of the proceedings, and the presiding justice did not submit it to the jury as an issue in the case. It cannot avail the plaintiff now because there was no evidence to support it.

The testimony upon which the plaintiff now relies as evidence of fraud may be summarized as follows: (a) The testimony of two witnesses that the preliminary scale was tested while the mill was in operation and that it overran. (b) The testimony of experts that a log scale made by caliper rule upon the basis of 100 cubic feet to 1,000 board feet will hold out. (c) Testimony that the plaintiff's logs were better than an average lot and, therefore, ought to overrun the log scale. (d) The admitted fact that the preliminary scale was made upon the basis of 115 cubic feet to 1,000 board feet, from

which it was argued that the mill scale ought certainly to have overrun.

The only argument which can be made from this evidence is that the mill scale was fraudulent because it did not hold up to the preliminary survey. This argument is fallacious, because the major premise upon which it must rest was not proved. The discrepancy between the log scale and the mill scale of the whole lot was only about nine per cent. It was not shown by the evidence, nor can it be assumed, that a discrepancy of this size indicates fraud in the smaller measurement.

One other item of testimony is put forward by the plaintiff as evidence of fraud, *i. e.*, the statement of one Covell, who ran the saw for a time, that certain lots of lumber sawed on special orders were not recorded upon the scale boards. The force of this testimony was wholly destroyed, however, by the subsequent production of the original scale boards, bearing entries of the lots of lumber mentioned by the witness. This testimony, therefore, wholly fails to sustain the claim that the mill scale was fraudulent.

3. Although there was much talk of waiver during the trial, it was almost wholly directed to the contention that the defendant had waived his right to complain about the way in which the logs were piled by the plaintiff, and this was one of the issues submitted to the jury by the presiding justice. No reference, however, to any claim that the defendant had waived his right to insist upon the mill scale appears in the charge, and the failure of the presiding justice to refer to a matter now claimed to be of vital importance is fully explained by the entire lack of evidence to sustain the present claim.

The plaintiff in his brief calls attention to five items of evidence which he says support his position.

(a) The admitted fact that one Keazer was employed jointly by the defendant's agent, the plaintiff and a sub-contractor under the plaintiff named Roby, to survey the logs as they were hauled to the mill, (b) The fact that during the progress of the work the defendant found no fault with Keazer's scale, (c) The fact that other contractors were paid on the basis of Keazer's scale, (d) The fact that a month after the plaintiff completed his work the defendant paid his five hundred dollars on account, (e) The testimony of the witness Roby that the defendant still later asked him to deliver the following message to Bechard: "If you see him, you tell him that I will pay him what I owe him if he will take $700 or $750."

(a) In order to determine what significance should be attached to the employment of Keazer, it is necessary to inquire why he was hired. The plaintiff in his testimony did not try to explain the reasons for Keazer's employment. He simply stated that the logs were scaled as they were delivered, that Leslie Cook, the defendant's agent in charge of the job, scaled the first eight or ten thousand and Keazer the rest. In answer to the question, "Who employed Coleman Keazer?" he replied, "Ed Roby, Les Cook and I." He further stated that he paid Keazer "not quite a third" of his wages, that Roby paid him the same amount, and that Cook paid him the balance. Roby and Keazer, called as witnesses by the plaintiff, testified to the same effect, but added nothing significant to the plaintiff's testimony.

Leslie Cook, called as a witness by the defendant, first put into words the reason why Keazer was employed and testified as follows: "Q. Now what was the purpose of Mr. Keazer's scaling those logs? A. Mr. Keazer was to scale those logs. I saw that we wasn't going to saw lumber out as fast as we anticipated, and I knew that we had got to pay Mr. Bechard once a month, advance him some money. I had no other way of knowing how much to advance him if we didn't get a preliminary scale of some kind. Q. And that is the only purpose? A. That is the only purpose."

Upon cross-examination he testified as follows: "Q. Now I understood, Mr. Cook, you to say in the course of your testimony at the time you employed Mr. Keazer you saw that you weren't going to saw as much as you anticipated? A. Yes, sir. Q. And that was the reason that you employed him? A. Yes, sir."

This testimony was uncontradicted and was corroborated by the evidence of the situation in which the parties found themselves at the time. The contract provided that the mill scale should determine the amount delivered by the plaintiff, but it also provided that he should be paid on the fifteenth of each month for all work done during the previous month. These provisions clearly indicated an expectation on both sides that the mill scale would be available within fifteen days after the logs were delivered. But when the plaintiff began operations about November 15, the mill had not been erected and sawing was not in fact begun until the following January. It was, therefore, clearly impossible to make monthly payments to the plaintiff according to the mill scale, and if he was to be paid monthly as the work progressed, a preliminary scale was a necessity. Roby, a sub-contractor under the plaintiff, was also

vitally interested in having a log scale in order that he might have a definite basis of settlement with the plaintiff. There can therefore be no doubt but that the above considerations indicate the true reasons for the employment of Keazer, and there is no suggestion of any other reason in the testimony. The testimony of the plaintiff quoted above with reference to the mingling of other logs with his clearly indicated his understanding that the mill scale governed, at a time long after Keazer had commenced work. In this state of the proof the action of defendant's agent in hiring him could furnish no ground for a conclusion that he thereby waived the defendant's right to insist upon the mill scale as the basis of his final settlement with the plaintiff.

(b) No reason why the defendant should have found fault with Keazer's scale during the progress of the work has been suggested, and his failure to do so is without significance upon the question of waiver.

(c) It did not appear that the defendant had any written contracts with the other contractors who furnished logs to the mill, or any agreements that they should be bound by the mill scale. Consequently, the fact that he paid them upon the basis of Keazer's scale has no bearing upon the question whether the provisions of his contract with the plaintiff were waived.

(d) and (e). It appeared in evidence that on May 1, 1925, more than a month after the plaintiff had completed his work, the defendant gave him a note for one thousand dollars, which the plaintiff was unable to discount, that thereafter he paid the plaintiff five hundred dollars on account, and the witness Roby testified to the offer of settlement set forth above. After stating these facts in his brief, the plaintiff argues as follows: "The jury could find that such conduct on the part of the defendant, with a full knowledge of all the facts, was not consistent with an intention to insist upon a strict compliance with the terms of the contract on the part of the plaintiff." If this argument were otherwise sound, its force is wholly destroyed by the assumption that the defendant had "full knowledge of all the facts," when he took the steps above enumerated.

It appeared that the sawing of the logs in question was subject to various delays and was not completed until the middle of November, 1925. Consequently, in May of that year the defendant could not have known whether the mill scale would finally hold up to the preliminary scale or not. This was a vital fact about which he had no knowledge. Furthermore, the witness who testified to the alleged

offer of settlement said that the defendant added the following significant words: "I thought this lumber was not going to hold out, but I know it is now." This remark clearly indicated, not that the defendant had abandoned the mill scale as the measure of his indebtedness to the plaintiff, but that he mistakenly believed at the time that it was going to agree with the preliminary survey. No finding of waiver could therefore be predicated upon the foregoing facts.

4. Plaintiff's claim of a right to rescind the contract is thus set forth in his brief: "There is another phase of the case upon which the plaintiff had a right to go to the jury. The written contract provided, or it could be found as an inference therefrom, that the defendant agreed to keep the rollway clear so that the plaintiff could deliver his logs thereon. The evidence as hereinbefore pointed out showed that the defendant did not keep the rollway clear. From this evidence the jury could find that the defendant broke the contract, and having broken it the plaintiff was entitled to recover for all logs delivered to the defendant's mill as determined by a scale made in accordance with the law of this state." This theory of the plaintiff's right was adopted by the court, and the issue was submitted to the jury as follows: "If the defendant fully performed his part of the contract substantially in accordance with its terms, plaintiff is entitled to payment as determined by the scale of the owner of lumber at the brow of the mill, if defendant did not fully perform his contract substantially in accordance with its terms, plaintiff can recover from the defendant for the benefits he, the defendant, has received from his labor. . . . Another equally important question here is: Did defendant perform his agreements under the contract? If he did, the scale of the manufacturer and owner of the lumber at the brow of the mill would determine the amount delivered by the plaintiff under this contract when accepted, for which he should be paid. If the defendant did not perform his part of the contract in accordance with the terms thereof, the plaintiff is entitled to recover for the benefits he has conferred upon the defendant, and you may or may not accept the scale of the manufacturer of lumber at the brow of the mill, as correctly representing the amount delivered, and it is for you to consider all the evidence in the case in arriving at the amount due him, if you find anything to be due."

The doctrine of rescission, which obviously underlies both the argument of the plaintiff and the above instructions to the jury,

had no legitimate application to the present case. It is well-settled law that a right to rescind must be exercised within a reasonable time after the discovery of the facts from which it arises, and that the rescission must be unequivocal. *Clark* v. *Manchester*, 51 N. H. 594; *Willoughby* v. *Moulton*, 47 N. H. 205; *Weeks* v. *Robie*, 42 N. H. 316; *Cook* v. *Gilman*, 34 N. H. 556; *Webb* v. *Stone*, 24 N. H. 282, 288; 13 C. J. Contracts, *sec.* 670.

A party "cannot treat the contract as binding and as rescinded at the same time, and after he has elected to stand by the contract and receive the benefits it confers on him, and has thus ratified and confirmed it, he cannot thus rescind and repudiate it." *Willoughby* v. *Moulton*, *supra*.

In this case, as pointed out above, it was evident when the plaintiff began operations that the defendant would be unable to saw the logs as they were hauled and, therefore, that the rollway could not be kept clear. Yet the plaintiff elected to keep on with the job and piled the logs in other places. For the extra work thus involved he claims compensation under the second item of his specification. His operations covered a period of over four months, during which time he received payments from the defendant aggregating eleven thousand dollars. During all this time no suggestion of rescission was made by him. It may be said in this case, as it was in *Webb* v. *Stone*, *supra*, that "till the trial, the agreement of the plaintiff has been treated as binding." In the first item of his specification he sets forth his claim "as per contract," and even during the trial his counsel made the following statement: "I will take the contract and be bound by it." Under these circumstances it is plain that the doctrine of rescission cannot now be invoked.

Defendant's first request for instructions reads as follows: "Under the terms of the contract, the plaintiff is bound by the scale of manufactured lumber at the brow of the mill." From the foregoing discussion it follows that this instruction should have been given and that the inconsistent instructions above quoted were erroneous.

The second item in the plaintiff's specification for extra work rolling and piling logs presented a question of fact for the jury. As pointed out above, it was a fair inference from the language of the contract and the situation of the parties when it was executed, that both sides expected the mill to saw the logs delivered by the plaintiff practically as fast as they were drawn in, and consequently, if the work of piling them in the yard cast upon the plaintiff an additional burden of expense, he would be entitled to reimbursement. It follows

that there was no error in the admission of evidence to sustain this claim. The last two items of the plaintiff's specification also presented questions of fact for the jury, and it therefore follows that defendant's motions for a nonsuit and a directed verdict were properly denied.

Since the verdict must be set aside because the case was submitted to the jury upon an erroneous theory of the plaintiff's rights, it is unnecessary to decide the other questions of law raised by defendant's various exceptions which are not likely to arise at another trial.

*Verdict set aside: new trial.*

All concurred.