**PLYMOUTH VILLAGE FIRE DISTRICT**

v.

**NEW AMSTERDAM CASUALTY COMPANY and P. DiMascio & Son, Inc.**

**P. DI MASCIO & SON, Inc.**

v.

**PLYMOUTH VILLAGE FIRE DISTRICT.**

Nos. 1161 and 1173.

United States District Court,
D. New Hampshire.
Jan. 28, 1955.

Robert G. Wakefield, Plymouth, N. H., Nighswander, Lord & Bownes, Arthur H. Nighswander, Laconia, N. H., for Plymouth Village Fire District.

Orr & Reno, Robert H. Reno and Malcolm McLane, Concord, N. H., for P. DiMascio & Son, Inc.

CONNOR, District Judge.

These are two actions arising out of a contract entered into between the Plymouth Village Fire District, a municipal corporation organized and existing under the laws of the State of New Hampshire, hereinafter referred to as the district, and P. DiMascio & Son, Inc., a body corporate existing under the laws of the Commonwealth of Massachusetts, and hereinafter referred to as the contractor, for the laying of about 5.3 miles of water mains, together with incidental work and associated projects, in the town of Plymouth, New Hampshire.

The district brought suit in the Superior Court for Grafton County, New Hampshire, upon a performance bond dated June 19, 1951, in the penal sum of $105,172, executed by the contractor as principal and the New Amsterdam Casualty Company as surety. It alleges that the contractor materially breached the contract, sufficient to warrant termination, and seeks to recover the cost of completion, less certain credits, plus liquidated damages for the failure to timely complete. The net claim of the district is in the sum of $34,180.98. In answer to the district's complaint, the contractor and the casualty company specifically deny the allegations of the complaint charging breach of contract, and aver that the district waived certain provisions and conditions, prevented performance, caused delays, and terminated the contract without legal justification. It is likewise contended that the district did not come into court with clean hands, and that the contract itself was illusory, unconscionable, and unenforceable.

The action was removed to this court and tried without jury with that of P. DiMascio, Inc. v. Plymouth Village Fire District, filed in this court shortly after the above action had been removed, and brought to recover for the alleged re-

fusal of the district to pay the sum of $11,917.86, with interest from December 22, 1951, for services rendered under the contract.

The district had retained the engineering firm of Howard & Whitman of Boston, Massachusetts, to formulate plans and specifications for the improvement of the water supply system, and to supervise and inspect the work as it proceeded. The contractor, having provided the lowest bid on a proposal to lay these water mains upon the engineer's estimate of quantities, was awarded the contract on a unit price basis. Work was to be completed 150 days after July 9, 1951. The contractor proceeded to work and continued to lay pipe as was indicated by the resident engineer, and had laid a total of 23,396 feet when operations were suspended during December. At that time, there remained work to be done, the extent of which is in dispute. The project was not pursued during the winter months, and on April 10, 1952, the district, on notice to the contractor, terminated the contract, alleging various grounds which will be dealt with in detail. The district commissioners thereafter, invoking the provisions of Article 12, engaged another contractor, on a cost plus basis, to complete the job, and work was resumed May 20, 1952.

### Findings and Rulings.

The nub of the primary controversy is the existence or lack of sufficient grounds warranting the action of the district in terminating the contract. On April 10, 1952, the district sent a letter to the contractor directing it to discontinue all work. The assigned reasons in the order appearing in the directive are (1) that the contractor had abandoned the work to be done under the contract, (2) that the engineers in charge of the project certified that they were of the opinion that the conditions specified in the contract as to the rate of progress were not fulfilled and that the work was unnecessarily and unreasonably delayed, and (3) that it was the

information of the commissioners that the corporation P. DiMascio & Son, Inc. was dissolved by vote of its board of directors on December 24, 1951.

In December, 1951, weather conditions precluded continuation of the work, and the contractor stored all its equipment in the town. Maintenance of the areas of work during the winter was not overlooked. The continued upkeep of the streets was the subject of a conference between P. DiMascio, the president, and the representatives of the district. While there is some doubt whether the arrangements made resulted therefrom, it is clear that the contractor was notified that agents of the district would look after the streets and that it would be held responsible, and liability for the expense was readily admitted.

■ As spring approached, the contractor returned to Plymouth on several occasions. The intention of the contractor at that time is the subject of conflicting testimony. I find that its activities were equally consonant with an intention to resume as soon as the frost left the ground. Moreover, on February 4, 1952, the district issued a draft for $2,017.35 in payment for the work performed in December, 1951. Surely such tender is not supportive of a belief that the contract had been abandoned. The dissolution of the corporation was motivated by reasons unrelated to the Plymouth contract. The stockholders entered into an agreement whereby all the corporation's equipment would be available to finish the project. The old corporation would see the Plymouth job through, but it would not take on any new work. Under the statute, the corporation remained *in esse* for specified purposes (infra). These considerations negate any inference of abandonment which otherwise might be drawn. Accordingly, this court finds that the contractor was willing and able to complete the job at the time the district issued its directive.

■ The second ground alleged by the district in its letter concerns itself

wholly with the contractor's dilatory conduct. It is not seriously contended that the contractor should have continued to perform during the winter or that it should have resumed operations before the date of termination. Thus it appears that this allegation relates to the failure to complete the project within the agreed time.

It seems advisable to set forth in detail the principles which this court deems applicable to this phase of the case. When a contract is broken in a material respect, the injured party is accorded a choice of remedies. He may treat the contract at an end and sue for the breach, or he may continue the contract in operation despite the breach and retain the right to such damages as he has suffered. Williston on Contracts, s. 683. An election between these remedies must be made within a reasonable time after knowledge of the breach. Bechard v. Amey, 82 N.H. 462, 136 A. 370. When the injured party treats the contract as operative after knowledge of the breach, his conduct is incompatible with an intention to consider the contract at an end, and, therefore, he is deemed to have elected not to assert the breach as cause for refusing to continue the contract. "If after the time has already elapsed the owner permits the builder to continue to work, even if the contract or materiality of the breach gave the owner power to terminate the contract on such a contingency, his conduct is an election to go on with the contract rather than to forfeit it, and on the completion of the work the owner is liable for the price, though he is entitled to a cross-claim for any damages caused by the delay." Williston on Contracts, s. 699. "If a party to a contract which remains wholly or partly executory has ground for rescinding or terminating the same, and is aware of the fact, but nevertheless permits the other party to continue in the performance of the work * * * particularly where this involves the expenditure of labor or money, this amounts to a waiver of the right to rescind."

Black on Rescission and Cancellation, s. 605. See also, Corbin on Contracts, s. 756; Restatement, Contracts, s. 309; Bechard v. Amey, supra. Election is final; it cannot be nullified at the whim or caprice of the injured party. See Williston on Contracts, s. 688.

Applying these principles to the facts at bar, I rule that the district elected to forego its right to terminate the contract because of delay in 1951 and to rely upon damages for breach of contract. The district permitted the contractor to continue after the time fixed for completion. An estimate and certification for payment for work done during December was compiled in January, 1952, and the district issued its check dated February 4, 1952, in payment. The work remaining was inventoried on January 15 by the resident engineer, and therein is found the notation "contemplated spring work." In short, the district gave every indication that it did not intend to terminate due to the contractor's delinquency. The fact that the district relied upon a certificate of the engineers in asserting delay as a justification for terminating does not add to the validity of this claim. The contract contained a clause directing that the engineer's determination · of questions pertaining to the contractor's fulfillment of its obligation shall be "final and conclusive." The engineer in effect is appointed an arbitrator of controversies arising in the course of performance, and the existence of the facts which he certifies cannot be controverted in the absence of fraud or bad faith. However, such procedure cannot provide a party to a contract with insulation from the consequences of the application of the legal principles of waiver and election.

█ Finally, the district in its directive assigned as a cause that P. DiMascio & Son, Inc. was dissolved, but the reason for believing that this justified termination is left to conjecture. It is argued that dissolution is cogent evidence of abandonment. This claim already has been rejected (supra). Nor

was the proviso forbidding assignment or subletting violated. The applicable law, Mass.G.L. Ch. 155, § 51 specifically provides that a corporate body continues in existence for three years after the time when it would have been otherwise dissolved "for the purpose of prosecuting and defending suits by or against it and of enabling it gradually to settle and close its affairs". This statute, coupled with the agreement of the shareholders, amply refutes this suggestion.

It is strongly urged that the district was warranted in its action because of material breaches. I am satisfied that whatever rights it had in this respect have been lost by failing to act within a reasonable time and by treating the contract as operative after the occurrence of the asserted breaches. See authorities cited, supra.

Upon the foregoing, I conclude that the district wrongfully terminated the contract and cannot recover the cost of completion under Article 12.

During the life of the contract, the contractor breached its covenant in several respects. Generally speaking, it did not properly backfill the excavations, failed to make repairs to certain parts of the highway and sidewalks of cement construction, and failed to clean up the areas of work. The pipe laid across Baker River was not adequately protected and required the installation of riprap. The district claims damages for these breaches, and contends that the contractor was actually allowed more, on a unit price basis, than it should have been, because incidental work remained to be done.

The total charge against the contractor as paid to DiMinico & Pallota, the substitute contractor, is $34,170.08. This may be broken down as $11,097.39 for cement construction, $10,276.25 for cleaning up various streets and properties, and $2,619.40 for riprap at the river crossing. The balance of $10,177.04 represents the cost of pipelaying on Merrill Street, which, in the light of the findings already made, becomes unimportant.

It is a fundamental principle of the law of contracts that an injured party has a duty to minimize the loss arising from breach. An award of damages represents compensation for losses necessarily suffered. A priori, one seeking to recover the expense of correcting defective work must convince the court that the damages sought represent charges which were justly and fairly incurred. As far as appears from the engineer's certificates, $3,050 was withheld from payment to the contractor as reflecting the dollar value of the incompleted work. It is of significance that the amount now sought is $20,000 more than the sum withheld by the district. The disparity of these respective costs is a severe tax upon the credulity of the court. Bearing in mind this spread, it seems incompatible with any theory of justice to permit recovery for the sum claimed. The records admitted in evidence consist of daily worksheets made by the resident engineer with the various charges for each day, his daily reports, and certain schedules and daily breakdowns made by C. Wickerson, one of the engineers. The greater portion of the data from which these records were compiled was furnished to the engineers by the substitute contractor, and in no instance were its contemporaneous daily records before the court. Opportunity to examine these and to test their veracity and accuracy was not available to counsel. In this connection, there was lacking in evidence the quantum and locale of the work allegedly done. The substitute contractor was engaged by the district on projects unrelated to the completion job, and in numerous instances there are flagrant inconsistencies in allocating labor, materials, etc. These factors do not characterize the records as trustworthy or convincing. Some of the work was overdone, i. e., material and labor were expended beyond what in reason and good workmanship was contemplated by the original contract. Certain of the streets were in need of resurfacing prior to the beginning of any work. The only requirement of

resurfacing referred to in the contract pertained to the excavation area, approximately two feet in width. The district in its arrangement with the substitute contractor undertook to prepare the entire area of these streets for surface replacement, and now charges the same to the contractor. The Titus property was restored to a condition superior to its previous state, at an unwarranted expense.

A substantial portion of the charges was for equipment. The rental at a daily, instead of a weekly or monthly rate, is indicative of the district's indifference. Whether the equipment was reasonably required to the extent charged is doubtful. An instance of what appears to be an excessive expenditure is the extensive mileage of a car used by the substitute contractor. Likewise, there are numerous charges which clearly are improper under the cost plus agreement, such as, office wages, sharpening hand tools, equipment storage, garage rent, excessive living expenses for the supervisor, excise tax and truck registration. I am constrained, on the state of the record, to reject this claim.

The district's claim in the amount of $889.86 for the expense of repairing the water pipe on Weeks Street and damage to sewers, is fully supported and allowed.

The district contends that, under Article 13 of the contract, it is entitled to $10,500 as liquidated damages for the failure to complete within the agreed time. The contractor argues that this proviso is a stipulation for a penalty and unenforceable. The disputed article provides that "The contractor shall pay to the District * * * for each and every calendar day that he shall be in default in completing the work as herein provided, the sum of Thirty-Five Dollars ($35.00), which sum is hereby agreed upon, not as a penalty but as the damages which the District will suffer daily by reason of such default."

The enforceability of this provision depends upon the intention of the parties, the reasonableness of the sum stipulated in the light of anticipated damages, and the nature of the damages which the parties attempted to liquidate. See Langlois v. Maloney, 95 N.H. 408, 64 A.2d 697, and authorities cited therein. Considering the language of the contract, the type of work undertaken, and the nebulous nature of the damages that would be occasioned by any delay, I find that the parties intended to liquidate, in advance of possible breach, the damages which would result therefrom. In determining the reasonableness of the stipulated sum, the situation confronting the parties at the time the contract was executed is the salient consideration. Applying this principle, it was certain that the district would be damaged by the failure to complete on time. The parties, with a full understanding of the effects of delay and before any differences arose, were more competent to determine the amount than a court or jury. The right to freely contract in regard to conjectural damages should be safeguarded, unless it has been clearly abused. If the sum is compatible with the object of compensation, the court should recognize it as a liquidation. In re Lion Overall Co., D.C.S.D.N.Y.1943, 55 F.Supp. 789, affirmed United States v. Walkof, 2 Cir., 144 F.2d 75, 154 A.L.R. 1250. It is my view that this stipulation is consonant with this objective.

There are numerous decisions in other jurisdictions applying the same principles which have enforced such stipulations in circumstances substantially similar to those presented in this case. Walsh Construction Co. v. City of Cleveland, D.C.N.D.Ohio 1920, 271 F. 701 (construction of a city reservoir, $50 per diem damages held to be not so unreasonable as to be void as a penalty); Ayres & Graves v. United States, 5 Cir., 95 F.2d 502 (construction of a levee, $20 per day held a valid pre-estimate of the loss occasioned by delay); City of Reading v. U. S. Fidelity & Guaranty Co., D.C.E.D.Pa.1937, 19 F.Supp. 350 (construction of a water supply tunnel, $50 per diem held a reasonable liquidation of damages).

The district is entitled to the amount of $4,410, a sum equal to the product of the multiplication of $35 by the number of calendar days between December 6, 1951 (date fixed for completion), and April 10, 1952 (date of termination). Whether the district would be entitled to the per diem stipulation for the period of days reasonably required to complete the work, cannot be determined, since there is no evidence upon which such a computation can be made. Contrary to the contractor's contention, I find that no appreciable delay was occasioned by the district.

There are certain items amounting to $1,535.62 which, by stipulation, are chargeable to the contractor.

In its cross action, the contractor has elected to forego suit upon the contract and claims only the fair value of its work. In Carroll v. Giddings, 58 N.H. 333, a similar situation was presented. The parties executed a written contract, and the promisor, without right, discharged the contractor when he had partially performed. The court held that general assumpsit was maintainable "* * * when a contract is at an end, either by its provisions or by the wrongful act of the defendant, so that nothing remains to be done but to pay money, general assumpsit will lie." "The act of the defendant gave the plaintiff the right to treat the contract as ended, and he can maintain his action of assumpsit on a quantum meruit." See also, Restatement, Contracts, 347, 251, Illustration 4. It follows that this remedy is available.

The contract prescribed a procedure for monthly payments based upon the work done, and when an item was incomplete, the proportionate value of the unfinished portion would be estimated and deducted from the total price. Other deductions were made pending final completion, and the engineers then certified that upon the statistics set forth the district was justified in paying a specified sum. The quantities contained in these monthly certificates provide the best evidence of the quantum of the work, and the contract prices afford the best evidence of the fair value of the work. In accordance therewith, the sum of $63,499.80 has been earned, $57,149.82 of which has been paid, and $6,349.95 withheld pursuant to Article 20 pending completion. Wrongful termination causes this sum to be immediately available to the contractor, and it is allowed.

The sum of $2,000 was withheld under certificate number 6, because the contractor had not properly consolidated the trenches and failed to place thereon a gravel subbase. On the state of the evidence, I am satisfied that the finding of the engineers, considered in conjunction with the work done by the substitute contractor, discloses the absence of performance to this extent.

Respecting the claim for $750, withheld under certificate number 6 and representing 25% of the total cost of the pipelaying at the Baker River crossing, I rule that this claim cannot be maintained, because the work was not completed.

Item 23 of the original contract provides for the building of a gravel roadway and the completion of a parking area at the low-level pumping station for the sum of $5,000. Before executing the contract, the litigants agreed to eliminate this project. Subsequently, the contractor agreed to build the gravel roadway for $3,000. This agreement was not conditioned upon adequacy of the fill made available to the contractor. While it is true that the gravel bank donated by the district was not sufficient to complete the roadway, I cannot agree with the contention of the claimant that there was any agreement for additional compensation. The amount of consideration is clear and explicit, and the claim for $1,800 is rejected.

The final facet of this controversy concerns several claims for the fair value of extra work allegedly performed by the contractor. The district makes a blanket objection because of failure to comply with Article 14 of the contract, which, *inter alia*, requires written authorization and prescribes a procedure for the presentation of itemized state-

ments of claims for extra work, and purports to forfeit those not so presented. This contention overlooks the nature of the contractor's action, which is a suit off the contract, rather than upon it.

On Highland Street, the course of the pipeline would have been impeded by a catchbasin. The situation presented a choice of removing the basin and the incidental 18-inch storm-sewer pipe, or circumventing it. If the latter alternative were chosen, the district would have had to furnish special angle joints and additional pipe. Mr. Bauer, the resident engineer, after estimating the relative cost of the alternatives, considered the former the more economical for the district. After obtaining the approval of Commissioners Gadd and Harvey, the contractor was instructed accordingly. It was recognized that the contractor would be entitled to compensation for this extra work, and Bauer requested a written order of authorization from his employer. The district's position is that this expense should be borne by the contractor because the contract required it to restore any catchbasin interfered with. Common sense dictates that this obligation did not extend to burden the contractor with the cost of replacing and restoring structures which the engineers ordered removed, especially where, as here, a reasonable alternative was available. The sewer pipe had to be relocated, and, to replace what was not salvageable, the contractor purchased pipe at a cost of $87.50. This item is sufficiently supported by the evidence, but the charges for labor and material are not, and are disallowed.

Additional claim is asserted for extra work performed at the high-level pumping station. It appears that the district contracted with another contractor for the construction of this installation and appurtenances. The fuel tanks which had been placed underground floated out, because of the high-water table and the failure to construct a cement base. There also was the matter of defective installation of a drain running from the pumping station to a manhole, the length of which was approximately 10 feet. Upon request of the engineers, the claimant corrected these defects, and in February, 1952, submitted a bill for $696, which the district admits it owes. However, it is now urged that this statement was not complete in that it did not include a charge of $210 for the net cost of 300 feet of drain pipe which the contractor furnished and laid as part of the work ordered by the engineers.

I find that there was a drainage ditch which hindered the laying of the water pipe in this area. In order to facilitate the work, the claimant proposed to fill in part of the ditch, and install a pipe-drain as a substitute. The district consented to this deviation, and furnished pipe with the understanding that no charge would be made. One impelling reason for accepting the district's version is the failure to include this charge in the bill rendered several months after the work was performed. This item is disallowed.

A further claim, in the amount of $1,310, is for furnishing and installing 524 feet of sewer pipe to replace that which was broken during the course of laying water pipe on Broadway, Hawthorne, Pleasant, and Langdon streets. The precise location of the sewerage system in these streets was unknown, and the following was inserted in the contract; "* * * Note: There is a sewerage system in the Town Streets, the location of which varies, and there are no available plans to show where the pipes etc. are placed. Test pits are to be dug at street crossings and at house service branches to determine the pipe locations and so as not to injure the pipe lines." This caveat provided a sufficient warning that some difficulty with the sewerage system should be expected, and that caution be exercised. Moreover, Article 4(e), which obliged the contractor to care for, replace and restore any sewer interfered with, provided a corresponding sanction in the event the warning was not heeded. This factor presumably was

taken into consideration by the contractor in formulating its bid. There is no evidence that the test pits were dug as recommended. It is my view that if the contractor had taken the precaution suggested in the notice and had employed a reasonably efficient mode of excavation, all or nearly all of the breakage could have been avoided.

In Civil Action No. 1161, Plymouth Village Fire District v. New Amsterdam Casualty Company and P. DiMascio & Son, Inc., I conclude that the plaintiff is entitled to the stipulated sum of $1,535.62, the sum of $889.86 for repairs as heretofore found, and the further sum of $4,410 as liquidated damages;—a total of $6,835.48.

In Civil Action No. 1173, P. DiMascio & Son, Inc. v. Plymouth Village Fire District, I conclude that there is due and owing to the plaintiff the sum of $6,349.98, withheld under the provision of the contract, the sum of $696 for the work at the high-level pumping station, and the further sum of $87.50 for extra work on Highland Street;—a total of $7,133.48.

The clerk is directed to enter judgment conformably to these findings and rulings.